**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RONALD TURNER, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No.: 11-cv-07771 |
| | ) | |
| RICK HARRINGTON,[1] | ) | Judge Robert M. Dow, Jr., |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION AND ORDER**

Petitioner Ronald Turner, an inmate at the Menard Correctional Center, has filed a *pro se* petition for a writ of habeas corpus [9]. Respondent Rick Harrington contends that four of Petitioner's claims are defaulted because he failed to present them through one complete round of state court review, and that the fifth is not cognizable in federal habeas proceedings. See [18]. Petitioner concedes that most of his claims are defaulted, but contends that any default should be excused because he can demonstrate cause and prejudice. For the reasons stated below, the Court respectfully denies the petition in its entirety and declines to issue a certificate of appealability.

I.      **Background**

A.      **Petitioner's Trial**

On June 10, 1994, construction foreman Marlon Pierre Hopkins was shot to death at a construction site on the south side of Chicago. After being arrested in connection with an unrelated crime a few months later, Petitioner gave a statement implicating himself in the Hopkins shooting. Petitioner also was identified in a photo array and police station lineup. Petitioner was charged with three counts of murder and one count of armed robbery. Petitioner

---

[1] The Court substitutes Rick Harrington, the current warden at Menard Correctional Center, for named Respondent Dave Rednour. See Fed. R. Civ. P. 25(d).

proceeded to a bench trial after unsuccessful attempts to suppress both his statement and the lineup identifications.

In its opening statement, the State averred that "[t]he detective will tell you that during the course of his investigation he determined that the defendant – there was a photo array shown. Two witnesses identified the defendant. There were lineups. And on August 5th, 1994, the Defendant Ronald Turner gave a handwritten statement admitting to his participation in the robbery/murder of * * * Hopkins." [19-4] at 10 (H-5). The parties stipulated that Hopkins's mother, the State's first witness, would identify the victim as her son. Dr. Joseph Lawrence Kosch-Cogan, the medical examiner who had autopsied Hopkins, testified and opined about Hopkins' gunshot wounds and cause of death.

Chicago police officer Ricky Bean testified that he responded to a call reporting a shooting on the afternoon of June 10, 1994. He testified that after calling an ambulance and securing the scene, he spoke to at least two witnesses, whom he identified as Robert Billings and Robert Peterson. Bean did not testify as to the contents of these conversations. Police officer Johan Naujokas testified that he arrived on the scene with his mobile crime lab after the ambulance had picked up Hopkins. He testified about photographs of the scene he had taken. Naujokas further stated that no physical evidence was taken from the area, and that no weapon was ever recovered.

Philip Cummings, who had been painting a fence at a nearby apartment complex at the time Hopkins was shot, testified that he heard two gunshots and then saw a "very tall guy who was very dark" carrying a brownish object – "[m]aybe like a towel and an envelope, maybe, and a brief case" – run past. [19-4] at 46-48 (H-41-43). Cummings was interviewed by Chicago Police detective Charles Rickher the next day. Cummings testified that he gave Detective

2

Rickher a description of the fleeing man, but was unable to recall and later denied describing the man as "black, 25 to 35 years old, 5-8, thin build, 120 pounds, very dark complected; nappy hair, thin mustache, buckteeth, and needed a shave." [19-4] at 46 (H-41); 63-64 (H-57-58). Cummings further testified that on July 31, 1994, he went to Robert Billings's apartment. Billings's mother, Pearlie Willis, was present, as was a man named Shannon and at least one police detective. Cummings could not recall whether Billings was present. The prosecutor attempted to refresh Cummings's recollection by asking him whether, when speaking to the State earlier that day, he had said that Billings was present at the apartment. Cummings stated that the prosecutor "didn't ask me was he present," "[y]ou asked me did Mr. Billings see the picture." [19-4] at 50 (H-45). Cummings reiterated that he did not recall Billings being present at the apartment on July 31. He also noted that he had talked to Billings in the hallway just outside the courtroom before taking the stand. See [19-4] at 52 (H-46).

Cummings testified that the police officers at Billings's apartment showed him an array of seven photos. Cummings testified that he identified a photo of Petitioner, but denied that he selected the photo in response to questions concerning the man who ran past him on June 10. The officers had asked him about "people who were over there that day looking for a job," [19-4] at 60 (H-54), Cummings testified, and he picked the photo of Petitioner because Petitioner had come by on the morning of June 10 and asked about a job at the construction site. On cross-examination, Cummings testified that Petitioner was not the man who had run by him on June 10.

Detective Charles Rickher provided testimony contrary to much of that offered by Cummings. He testified that when he interviewed Cummings on or about June 11, 1994, Cummings described the fleeing man as a black male, 25-35 years old, about 5'8" and 120

3

pounds, with a thin build, nappy hair, a thin mustache, and buck teeth. Rickher testified that on July 31, 1994, he went to Billings's apartment showed a photo array to Billings, Willis, and Cummings, all of whom were present in the apartment at the time. Rickher testified that Cummings identified the photo of Petitioner as the man that he saw running on June 10, 1994. Rickher did not testify as to which photos, if any, Billings or Willis selected from the array; he also made no mention of the lineup. Rickher performed an in-court identification of Petitioner, whom he had seen while investigating an unrelated incident on August 5, 1994. Rickher described Petitioner as approximately 5'10", "very slim," with short hair, a "scraggly mustache," and "gapped" and "misshapen" teeth. [19-4] at 83-84 (K-14-15). On cross-examination, Petitioner's counsel asked Rickher, "what identification did you require of Mr. Billings when you showed him the photo array?" Rickher answered, "I don't recall." Petitioner's counsel followed up by asking, "Did you recall – did you ask for any identification from Mr. Billings when you showed him the photo array?" Rickher responded "no." *Id.* at 76 (K-7).

State's attorney Catherine Hufford testified that she spoke with Petitioner on August 5, 1994, at the Area Two police station in Chicago. She testified that she advised Petitioner of his *Miranda* rights, after which he orally provided information about the shooting of Marlon Hopkins. Hufford testified that she then left Petitioner alone in the interview room while she handwrote the information Petitioner told her. She then reviewed her handwritten statement with him. She further testified that Petitioner read the statement out loud and made – and initialed – a few corrections and additions. In two places in the statement, she had erroneously written "Robert" instead of "Ronald"; she and Petitioner had corrected the errors and initialed their changes. On cross-examination, Hufford was unable to explain why she had written "Robert." She denied talking with anyone named Robert as part of the investigation in the case. Before she

began interviewing Petitioner, however, she spoke with Detective Rickher and Detective Keating and read various reports that the officers had prepared. See [19-4] at 86-94 (K-17-25); *id.* at 98-100 (K-29-31).

Petitioner's pretrial motion to suppress the statement was denied, and the prosecutor published the entirety of the statement into the record. The statement implicated Petitioner in the June 10, 1994 shooting of Marlon Hopkins:

> Statement of Ronald Turner taken August 5, 1994, at 11:00 o'clock p.m. at area two, violent crimes. Present ASA Cathy Hufford, Detective C. Rickher, Number 20712, Detective W. Keating, Number 20856.
>
> This statement taken regarding the fatal shooting of Marlon Pierre Hopkins which occurred on June 10, 1994, at 3:24 p.m. at 8732 South Burling.
>
> I understand that I have the right to remain silent and that anything I say can be used against me in a court of law. I understand that I have the right to talk to a lawyer and have him present with me during questioning and if I cannot afford to hire a lawyer one will be appointed by the court to represent me before any questioning. Understanding these rights I wish to give a statement. * * *
>
> After being advised of his constitutional rights and stating that he understood each of those rights and after being advised and stating that he understood that Cathy Hufford was an Assistant State's Attorney, a lawyer, a prosecutor and not his lawyer, Ronald Turner agreed to give the following statement in summary and not word for word.
>
> Ronald Turner states that he is 34 years old and attended Inglewood High School. Ronald Turner states that he can read and write English and he demonstrated that ability by reading the first few lines of this statement out loud.
>
> Ronald Turner states that on June 10, 1994, he went to 87th and Burling in Chicago. Ronald Turner states that he went there looking for a job. Ronald Turner stated that he had been going to 87th and Burling every other day trying to get a job from Big Boy. Ronald Turner states that Big Boy is the foreman of the workers there but that he doesn't know Big Boy's real name. Ronald Turner states that when he asked Big Boy for a job on June 10, 1994, that Big Boy told him he didn't have any jobs. Ronald Turner states that he then left.
>
> Ronald Turner states that he ' – 'that later that day on June 10, 1994, that he, Ronald Turner, was walking by 8732 South Burling when he saw Big Boy with the yellow envelope. Ronald Turner states that he knew that the yellow envelope contained money but he wasn't sure how much money it contained. Ronald Turner stated he didn't care how much money was in there. Ronald Turner states that he then walked up to Big Boy and said, 'Give me that' while he had a 357 magnum gun pointed at Big Boy. Ronald Turner states that he wanted Big Boy to give him the yellow envelope. Ronald Turner states that Big Boy said, 'Don't play with me.' Ronald Turner states that Big Boy tried to grab for the gun

so he shot Big Boy in the chest area. Ronald Turner states that when Big Boy grabbed his leg that he, Ronald, shot Big Boy a second time. Ronald Turner states he then took the yellow envelope from Big Boy and walked away.

Ronald Turner states that he always carries a gun on him for protection. Ronald states that he didn't think that Big Boy would hesitate in giving him the envelope especially when Ronald held a 357 Magnum pointed at him. Ronald Turner states that he got about $2,000 from the yellow envelope. Ronald states that he knew the yellow envelope contained money because it was Friday and Big Boy had to pay his workers.

Ronald Turner states that he was treated well by the police and Assistant State's Attorney Cathy Hufford. Ronald states that he was given a sandwich to eat and pop to drink. Ronald states that he was also allowed to use the washroom.

Ronald states he was not made any promises in return for his statement nor was he threatened in any way.

Ronald states that he is not under the influence of drugs or alcohol at the time he gave this statement.

Ronald states that he understood that he can make any corrections or additions to the three pages of this statement by asking Cathy Hufford, the Assistant State's Attorney, to do so now.

Ronald Turner further states that he didn't intend to shoot Big Boy in order to get the money. Ronald Turner states that if he would have had time to think he would have shot Big Boy in the hand or leg but not the chest.

[19-4] at 95-98 (K-26-29).

The defense called a single witness, Detective Rickher. Rickher testified that on August 5, 1994, he requested that Petitioner be released from Cook County Jail and transported to Area Two for questioning. He corroborated Hufford's testimony that he spoke to her at Area Two prior to her interview with Petitioner and provided her with all the reports related to the Hopkins investigation. See *id.* at 113-17 (K-44-48).

Neither Petitioner nor the State called Robert Billings as a witness, despite the conflicting testimony as to his presence on July 31, 1994, and his apparent presence at the courthouse. Neither side addressed the lineup, notwithstanding the State's mention of it during opening.

The trial court convicted Petitioner on two counts of first-degree murder but acquitted him of armed robbery. Petitioner was sentenced to 80 years' imprisonment on November 25, 1997.

6

**B.     Direct Appeal**

On direct appeal, Petitioner contended that the trial court erred in considering more than one victim impact statement and by convicting him of (and sentencing him for) two counts of murder when only one individual had been killed. The state conceded error on the latter point. On December 28, 1998, the Illinois Appellate Court vacated the second murder conviction but otherwise affirmed Petitioner's 80-year sentence. See [19-1]. Petitioner did not seek leave to appeal to the Illinois Supreme Court.

**C.     State Post-conviction Proceedings**

Petitioner drafted his initial *pro se* petition for state post-conviction relief on or about March 13, 1999. It bears a file-stamp date of September 16, 1999, however, which Petitioner attributed to circumstances beyond his control. (The state courts eventually ruled that it had been filed timely.) In that petition, Petitioner alleged that he had discovered new evidence – an "affidavit" from Robert Billings – that called into question the legitimacy of Petitioner's arrest, indictment, conviction, and sentence. Petitioner claimed that he could not have discovered this evidence earlier "unless he had effective assistance of counsel at trial and appellate court levels, or unless the prosecution did not impermissibly withhold or fraudulently concealed the eye witness evidence of Mr. Billings." [19-6] at 8 (C-7). Petitioner also alleged that his new evidence "discloses evidence inferring that the prosecution or its witnesses, the investigating arresting police officers and a female assistant state's attorney, likely and knowingly falsified, fabricated and committed perjury to obtained the arrest through to the sentence in this case." *Id.* at 9 (C-8)

The Billings affidavit, which Petitioner attached to his state post-conviction petition, averred that Billings "saw the person that shot and killed a man named Marlon Hopkins," *id.* at 22 (C-21), and decided to approach Petitioner's family and draft an affidavit with this

7

information after "[a] friend of mines in this year 1998, told Ronald Turner's family members were around the neighborhood asking people to contact them if they had any information." *Id.* at 24 (C-23). According to the affidavit, Billings told two uniformed police officers what he had seen when they arrived at the crime scene. They wrote down his description of the shooter in a black book and told him that he would later be called upon to identify the shooter. At some point in July 1994, two detectives came to Billings's home. They showed him a single photo of Petitioner and told him that some other people had identified Petitioner as the killer. Billings told the detectives that he knew Petitioner by the nickname "Snagga-tooth" and that Petitioner was not the man who shot Hopkins. According to the affidavit, Billings was about 150 feet away when he "saw another man – the killer, walk up and shoot Mr. Hopkins while Mr. Hopkins was talking to Ronald Turner, and that the killer took off running fast in one direction and Turner ducking his head like ran in another direction. The killer had a gun in his hand, and weight and skin color wise he looked like Ronald Turner." Billings did not get a good look at the killer's face because he had been standing so far away. He "saw Ronald Turner's face, and as far as [he] saw, Turner did not shoot the man, but was close enough to the man shot to have seen the guy that did the shooting." *Id.* at 22-23 (C-21-22).

The affidavit further reported that "in the last days of July or first days of August 1994," the same two detectives returned to Billings's home, this time with photographs of Petitioner "and an unknown person that appeared to look like Ronald Turner." The detectives told Billings that they believed that the unknown person was the shooter, but that Petitioner had confessed to involvement in the murder. They told Billings that they would need him to go to the police station to identify Petitioner and the unknown person. Billings told the officers that he "did not know if Ronald Turner was involved in the murder or not and that [he] would identify him as

8

being there on the murder scene and talking to the that was shot, before he was shot, and if [Billings] saw the killer again that [he] probably would be able to identify him." *Id.* at 23 (C-22).

Billings went to the police station at 111th Street on August 5, 1994, and "heard Ronald Turner by himself in a room, hand-cuffed to a wall, trying to hide his face, at the same time hollering and cursing loudly, the words along the lines of 'I know you bitches hear me, I want my lawyer here right now, this shit ain't right." [19-6] at 23 (C-22). Billings was then escorted from the room by an unknown female in plain clothes. Later, in January 1997, the detectives requested that Billings come to Cook County criminal court, specifically to the courtroom where proceedings were occurring in Petitioner's case. Billings was never contacted or questioned by any of Petitioner's attorneys. The undated affidavit contained a declaration that it was verified under penalty of perjury but the signature line labeled "Affiant" was crossed out in black marker. See [19-6] at 25 (C-24). The name "Robert Billings" appeared in cursive below that area, on a line labeled "Name." See *id.*

The trial court denied Petitioner's petition for post-conviction relief on December 3, 1999. It concluded that the petition not only was untimely based on the September 18 filing date, but also failed on the merits. The trial court concluded Petitioner had failed to demonstrate the prejudice required by *Strickland v. Washington*, 466 U.S. 668 (1984), because overwhelming evidence supported Petitioner's conviction and that evidence could not be overcome by the unsigned, undated, and unnotarized Billings affidavit even if the affidavit were admissible.

Petitioner appealed, arguing that the trial court erred in summarily dismissing his petition because his timely petition "clearly made out the gist of a constitutional violation." [19-7] at 43. The Illinois Appellate Court reversed. The Appellate Court could "discern no trial strategy which would support counsel's failure to interview and call Billings to testify." [19-7] at 22. The

Appellate Court further concluded that it was "unable to say with any certainty that had defense counsel interviewed Billings and then called him to testify, the outcome of the trial would have remained the same." *Id.* at 23. "Accordingly," it found "that defendant's petition stated the gist of a meritorious claim for ineffective assistance of counsel and therefore should not have been summarily dismissed for failing to state such a claim." *Id.* The Appellate Court also reversed the trial court's summary dismissal on timeliness grounds and remanded the case so that the trial court could assess the sufficiency of Petitioner's allegations that he lacked culpable negligence in filing his petition past the deadline. The Appellate Court further instructed the trial court to determine whether it may appropriately grant Petitioner leave to get the Billings affidavit properly notarized.

On remand, the trial court appointed a public defender for Petitioner. The public defender conducted an investigation and learned that Billings had a court date in Markham, Illinois, on September 30, 2005. See [19-7] at 163. The public defender attempted to talk to Billings at that time but Billings did not appear. The judge in Markham issued an arrest warrant for Billings, and the public defender returned to Markham on the return date of the warrant. Billings again failed to appear. The trial court declined the public defender's request to take the matter off the call until Billings could be located. Eventually, the public defender filed a certificate pursuant to Illinois Supreme Court Rule 651(c) in which she detailed her efforts to locate Billings, noted that she had filed a supplemental petition addressing the timeliness issue, but "as to the substantive allegation, [would] be standing on the pro se petition in view of the fact that [she had] been unsuccessful in locating Mr. Billings in order to have him notarize his affidavit." [19-7] at 179. The State moved to dismiss, and the trial court held an oral argument on the motion on May 30, 2006. The trial court determined that Petitioner had in fact mailed and attempted to file his

10

1Case: 1:11-cv-07771 Document #: 33 Filed: 05/24/13 Page 11 of 28 PageID #:1613

petition in a timely fashion, but nonetheless dismissed the petition because the Billings affidavit was "a statement which does not fall within the statute." [19-8] at 15.

Petitioner appealed this second dismissal of his post-conviction petition, arguing that he was entitled to an evidentiary hearing. See [19-10] at 26. On May 9, 2008, the Appellate Court again reversed the trial court's dismissal of the petition. The Appellate Court determined that Petitioner had "demonstrated a substantial violation of his constitutional right to effective assistance of counsel," and, though it expressed "no opinion as to the possible success or failure of [Petitioner's] claim of ineffective assistance of counsel," found "the petition and the record sufficient to warrant an evidentiary hearing." [19-10] at 12; see *Davis v. Lambert*, 388 F.3d 1052, 1060 (7th Cir. 2004) (describing three-stage Illinois post-conviction procedure). The Appellate Court instructed the trial court to convene such a hearing to examine, at a minimum, "the reasons why defense counsel did not interview Billings or call him as a witness." [19-10] at 12.

While the case was pending on remand, Petitioner's counsel finally managed to locate Billings. Counsel spoke with Billings and reported to the trial court that he "totally disavowed his affidavit." [19-11] at 42 (H-3). In light of Billings's disavowal the Office of the Public Defender filed a motion to withdraw as appointed counsel. The trial court denied the motion and held the ordered evidentiary hearing on February 24, 2009.

At the evidentiary hearing, at which Petitioner was not present, Petitioner's counsel detailed her conversation with Billings. She testified that she and her investigator had located Billings in the Danville Correctional Center on January 21, 2009. She "determine[d] through extensive questioning that the Mr. Billings that we were interviewing was indeed the same Mr. Billings who was present at the scene of the death of the deceased." [19-11] at 57 (I-9). Counsel reported that she "showed Mr. Billings the signed but unnotarized affidavit attached to Mr.

Turner's post-conviction petition," and that "Mr. Billings disavowed the affidavit." *Id.* at 57-58 (I-9-I-10). Billings "advised [counsel] that he had never seen another man shoot the deceased. He had never been in contact with Mr. Turner's family, and he had never signed this affidavit. He said that the signature on the affidavit was not his." *Id.* at 58 (I-10). Counsel noted that Billings "also did say, of course, that he never saw Mr. Turner shoot the deceased." *Id.*

The court sought clarification. "Basically, based upon your interview with Mr. Billings, he basically said he didn't see the shooting, period. He didn't see the defendant as a shooter and he didn't see any other man as the shooter." *Id.* at 58-59 (I-10-11). Counsel clarified, "No. He was standing in the situation. He was not facing either Mr. Turner or the victim. He heard shots. He turned around, and he saw Mr. Turner running, and he saw Mr. Hopkins fall, but he did not see the actual shooting." *Id.* at 59 (I-11).

Counsel informed the court that, on the basis of her conversation with Billings, she had made a strategic decision not to call him to testify at the evidentiary hearing because she did not "believe his testimony can help [Petitioner] in any way." [19-11] at 58 (I-10). Counsel did not call Petitioner or offer a reason for his absence at the hearing. Counsel told the court, however, that she had spoken to Petitioner on January 26, 2009, about her decision not to call Billings to testify. See *id.* at 59 (I-11). Counsel had informed the court of her conversation with Petitioner during an earlier hearing, and noted at that time that "Mr. Turner found this to be unacceptable." *Id.* at 44 (H-5). The court noted that Petitioner had filed a motion for substitution of counsel and appointment of a pro bono attorney, which the court denied in its entirety. The court explained that, "[i]t's clear that after conversation with you, [Petitioner] felt that you would not be able to be his lawyer and aid him in this pursuit, and he's indicated that he believed your inadequacies called for a complaint with the ARDC, and that there was a conflict of interest." *Id.* at 60 (I-12).

The state argued that Petitioner could not satisfy the prejudice prong of *Strickland* in light of Billings's disavowal of the affidavit. The trial court agreed that Petitioner failed to meet this burden and dismissed his petition. [19-11] at 61-62 (I-13-14).

Petitioner appealed the third dismissal of his petition. On appeal, he argued only that his post-conviction counsel did not provide reasonable assistance when she abandoned the claims in his petition and failed to call him and Billings to testify at the evidentiary hearing. See [19-13]; [19-14]; [19-16]. The Appellate Court affirmed the trial court on September 2, 2010. It concluded that Petitioner's post-conviction counsel "was not obligated to advance his frivolous claims at the evidentiary hearing" and had provided him with the requisite level of "reasonable assistance" required by Illinois law. See [19-13] at 7-10.

Petitioner filed a *pro se* motion for reconsideration. See [19-17]. In it, he argued that trial counsel rendered ineffective assistance, that the State fabricated evidence against him, and that post-conviction counsel rendered ineffective assistance. He asked the Appellate Court to permit him to testify at an evidentiary hearing concerning the Billings affidavit. See *id.* The Appellate Court summarily denied Petitioner's motion on October 1, 2010. [19-18]. Petitioner filed a petition for leave to appeal to the Illinois Supreme Court. [19-19]. He alleged ineffective assistance of trial counsel, falsification of testimony by the State, denial of the opportunity to cross-examine Billings, and denial of reasonable effective assistance of counsel during his post-conviction proceedings. See *id.* The Illinois Supreme Court denied leave to appeal on January 26, 2011. [19-20]. Petitioner did not file a petition for a writ of certiorari.

### D.       Federal Post-conviction Proceedings

Petitioner filed a *pro se* petition for a writ of habeas corpus on November 1, 2011. [1].

The Court received Petitioner's amended petition on November 4, 2011 [4], and docketed it on

December 5, 2011 [9]. Petitioner set forth three grounds for relief:

> (1) Ineffective Assistance of Counsel, Failure to investigate U.S, Const.
> 6th, 14th Amend. 1). trial Counsel failed to investigate potential or alleged
> eyewitnesses who the State claim during the testimony of detective Charles J.
> Rickher that occurrence witness Robert Billings had identified petitioner as the
> shooter during grandjury proceedings and reaffirmed during motion to suppress
> proceedings. The testimony was false and substantial to the finding of probable
> cause to indict, and denial of pre-trial motions. 2). The false evidence of
> identification was basis for probable cause to arrest.

> (2) Post-Conviction Counsel provided by the State completely abandon
> her client when she argued that petitioners claim should be dismissed during an
> evidentiary hearing where only the States Court and appointed counsel appeared.
> This claim of abandonment amount to NO representation at all during post-
> conviction proceedings at the evidentiary hearing where counsel had evidence to
> shape petitioner claims into proper legal form. Inlight of evidence to support the
> false evidence in ground one, when Robert Billings disavowed an prior affidavit
> but stated he did not witness petitioner shoot and kill the victim. U.S. Const. 14th
> Amend.

> (3) Petitioner's Due Process Right to appear at the evidentiary hearing to
> defend his case was denied where the State corrective process failed in a
> fundamental way in vaiolation of equal protection and Due process, Further
> petitioner was denied the right to proceed pro se without a hearing to determine
> the merits of petitioner's allegation, that is the State Court Post-Conviction Judge
> conducted no inquiry into petitioner underlying allegations 6th & 14th
> Amendment violation occurred.

[9] at 5-6 (all errors in original). In his accompanying brief, Petitioner emphasized Billings's new

testimony, as relayed through counsel at the evidentiary hearing, that Billings "never saw Mr.

Turner shoot the deceased." He contended that he had previously been unaware of this particular

bit of Billings's testimony, which in his view undercuts the police reports and grand jury

testimony stating that Billings identified him as the shooter. Petitioner invoked both *Napue v.*

*Illinois*, 360 U.S. 264 (1959), and *Brady v. Maryland*, 373 U.S. 83 (1963), contended that his

post-conviction counsel "lacked faith in petitioner['] s credibility and 'abandon' his petition," and

asserted that his "right to be present at the evidentiary hearing, his right that the allegations in his

petition be taken as true unless positively rebutted by the record, to present the testimony of

Billings, and to proceed pro se w[]ere all violated."

Respondent answered the petition on February 27, 2012. [18]. Respondent characterizes

the petition, liberally construed, as presenting five claims:

> (1) petitioner's trial counsel was ineffective for failing to call Billings, because Billings would have testified that he never saw who shot the victim, and this would have demonstrated that the police lacked probable cause to arrest and indict petitioner;

> (2) the State knowingly presented false testimony under *Napue v. Illinois*, 360 U.S. 264 (1959), because "the prosecution['s] agent[]s knew that Billings had never identified petitioner as the shooter, but repeated[ly] submitt[ed] the false and misleading material fact to, in police reports, as predicates for later affidavit supporting arrest warrant and the grand[ ] jury testimony of [detective] Keating, in violation of due process";

> (3) the State failed to turn over exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose that Billings did not witness the shooting;

> (4) petitioner's postconviction counsel provided ineffective assistance by abandoning him at the postconviction hearing; and

> (5) the postconviction courts denied petitioner due process and equal protection because "petitioner was denied the right to proceed pro se without a hearing to determine the merits of petitioner's allegation" and because "the State Court Post-Conviction Judge conducted no inquiry into petitioner['s] underlying allegations [that] 6th and 14th Amendment violation[s] occurred."

[18] at 11-12. Petitioner generally agrees with Respondent's characterization of his claims, see

[27], though he contends that his argument as to "Claim 1" is broader than Respondent describes.

See [27] at 1, 5. The Court will refer to the claims as Claim 1 through Claim 5, using

Respondent's numbering system.

15

Respondent argues that Claims 1, 2, 3, and 5 are defaulted, and that Claim 4 must fail because ineffective assistance of post-conviction counsel does not violate the U.S. Constitution. See [18] at 14-23. "Petitioner agrees with respondent that procedural default occurred in this case with respect to [Claim 1] and claim 2, 3, and 5, as these or this assertion of ineffective assistance of trial counsel failure to investigate and discover that Billings had not seen petitioner shoot the deceased was not presented in the initial post-conviction petition or any amended petition, marking the defaults begaining under state law." [27] at 2-3 (errors in original). Petitioner contends that these claims should nonetheless move forward because he can demonstrate cause and prejudice for the default, namely that he "was not present during evidentiary hearing but stuck in prison during proceedings and deprived of the information that [B]illings had affirmed he did not see petitioner shoot the deceased." See *id.* at 5-7 (errors in original). Petitioner also argues that the recent Supreme Court case *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), permits him to show cause due to the alleged inefficacy of his post-conviction counsel, who he alleges was constitutionally ineffective under *Strickland v. Washington*, 466 U.S. 688 (1984).

## II. Discussion

Although the *pro se* petition largely focuses on the Billings affidavit and the effect of its absence on his pretrial proceedings, see [9] at 8-19, it also argues that "the factual basis of grounds (I), (II), (III) did not become reasonably available until after February 24, 2009, when [Petitioner] received the transcript [of the evidentiary hearing] in the U.S. mail while in prison." *Id.* at 16. Petitioner's reply brief, in contrast, centers on the testimony from Billings that post-conviction counsel relayed at the February 24, 2009 evidentiary hearing. See [27]. The Court construes Petitioner's *pro se* filings liberally, *e.g.*, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *Warren v. Baenen*, 712 F.3d 1090, ___, 2013 WL 1316905, at *6 (7th Cir. Apr. 3,

16

2013), and assesses Petitioner's claims relating to both the Billings affidavit and the Billings testimony.

### A.      Default

Before a federal court can consider a petition for habeas corpus, a petitioner must satisfy several procedural requirements. If the claim comes from the Illinois state courts, as this one does, the petitioner must have presented each claim in the habeas petition to the Illinois Appellate Court and to the Illinois Supreme Court in a petition for discretionary review. *Smith v. McKee*, 598 F.3d 374, 382 (7th Cir. 2010) (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999)). As part of this requirement, a petitioner must have fairly presented both the operative facts and legal principles that control each claim to the state judiciary. *Id.* A petitioner's failure to fairly present each habeas claim to the state's appellate and supreme courts in a timely manner leads to a default of the claim, thus barring the federal court from reviewing the claim's merits. *Id.*; see also *Bland v. Hardy*, 672 F.3d 445, 449 (7th Cir. 2012) ("To preserve a question for federal collateral attack, a person must present the contention to each level of the state judiciary.").

Petitioners may avoid this procedural default only by establishing cause and prejudice to excuse the default or by showing that failure to consider the claim(s) will result in a fundamental miscarriage of justice. *McGee v. Bartow*, 593 F.3d 556, 565 (7th Cir. 2010). To demonstrate cause, Petitioner must show that some external impediment, such as the unavailability of the factual or legal basis for a claim, prevented him from raising the claims properly. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). "In order to show prejudice, [Petitioner] must prove that any errors worked to his '*actual* and substantial disadvantage.'" *Richardson v. Briley*, 401 F.3d 794, 801 (7th Cir. 2005) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). "A fundamental

17

miscarriage of justice occurs when a petitioner can prove that 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *Id.* (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

Respondent argues that Petitioner has defaulted Claims 1, 2, 3, and 5 by failing to fully present them to the state courts. Petitioner "agrees with respondent that procedural default occurred in this case with respect to [claim 1] and claim 2, 3 and 5," [27] at 2, but contends that he could not have possibly presented the claims to the state court because they are all predicated on a factual basis of which he was unaware prior to his receipt of transcripts of the February 24, 2009 evidentiary hearing conducted as part of his post-conviction proceedings. Petitioner does not argue cause and prejudice to the extent that his claims are predicated on the Billings affidavit; if those claims are defaulted, then, the Court may not consider them. See *Crockett v. Hulick*, 542 F.3d 1183, 1193 (7th Cir. 2008).

### 1.    Claims 1, 2, and 3: Billings Affidavit

Petitioner rightly concedes that Claims 1, 2, and 3 – the ineffective assistance of trial counsel, *Napue*, and *Brady* claims, respectively – have been defaulted to the extent that they rest upon the Billings affidavit. Petitioner alluded to Claims 2 and 3, the *Napue* and *Brady* claims, in his *pro se* state post-conviction petition. For instance, alleged that he could not have discovered the affidavit "unless the prosecution did not impermissibly withhold or fraudulently concealed the eye witness evidence of Mr. Billings," and that the affidavit "discloses evidence inferring that the prosecution or its witnesses, the investigating arresting police officers and a female assistant state's attorney, likely and knowingly falsified, fabricated and committed perjury to obtained the arrest through to the sentence in this case." Petitioner failed to fully present those claims on appeal to the Illinois Appellate Court and Illinois Supreme Court, however. Petitioner appears to

have abandoned his *Brady* claim entirely after presenting it to the trial court. Petitioner alluded to his *Napue* claim in his petition for rehearing by the Illinois Appellate Court. See [19-17] at 5 ("either the police reports are fabricated or the testimony is false, especially as it relates to Robert Billings"); *id.* at 6 ("investigating officer testified contrary to the initial investigative reports and police reports"), as well as in his petition for leave to appeal to the Illinois Supreme Court. See [19-19] at 2 ("Can a petitioner's conviction rest on falsified testimony concerning identification of petitioner from investigation officers."); *id.* at 7 ("either the police reports are fabricated or the testimony is false"); *id.* at 11 ("the police was aware that it mislead the grand jury on the material factor of identification of billings"); *id.* at 12 ("At trial the police unknown to the jury testified that Billings had not identified petitioner * * * * Such evidence at trial was clearly false"). But Petitioner failed to make even a vague mention of his *Napue* claim on appeal, when he was represented by counsel. This omission defaulted his claim; a petitioner is "required to raise the claim at each level of state court review: in his initial post-conviction petition before the trial court, in his appeal to the Illinois Appellate Court, and in his Petition for Leave to Appeal (PLA) to the Illinois Supreme Court." *Smith v. Gaetz*, 565 F.3d 346, 352 (7th Cir. 2009); see also *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007) ("In Illinois, this means that a petitioner must have directly appealed to the Illinois Appellate Court and presented the claim in a petition for leave to appeal to the Illinois Supreme Court."). Petitioner's *Napue* and *Brady* claims, Claims 2 and 3, are defaulted to the extent that they are predicated on the Billings affidavit.

Claim 1 presents a closer call but Petitioner also concedes that it is defaulted. Petitioner presented his post-conviction claim that trial counsel was ineffective for failing to investigate Billings and present the testimony contained in the affidavit to the trial court. See [19-6]. Yet

after the trial court eventually passed on the merits of the claim, see [19-11] at 61-62 (I-13-14), Petitioner, represented by counsel, argued on appeal only that his post-conviction counsel provided unreasonable assistance. See [19-14]. After the Illinois Appellate Court rejected this argument, Petitioner filed a *pro se* petition for rehearing in which he asserted that trial counsel was ineffective for failing to call Billings. See [19-17] at 4-5. Petitioner reiterated that assertion in his Petition for Leave to Appeal.  See [19-19].  Although he presented Claim 1 to the Illinois Supreme Court, he did so without first providing the Illinois Appellate Court the "operative facts and applicable law" pertinent to Claim 1 at the appropriate juncture. *Johnson v. Hulett*, 574 F.3d 428, 431 (7th Cir. 2009). Petitioner thus failed to exhaust Claim 1 to the extent that it rests upon the Billings affidavit.

### 2.      Claims 1, 2, and 3: Billings Testimony

Petitioner also asserts Claims 1, 2, and 3 with the Billings testimony as their factual predicates. These claims, with this factual predicate, were never presented to the state trial court. They are thus defaulted, as Petitioner concedes.[2] Petitioner argues that he can demonstrate cause and prejudice to excuse the default. He contends that he "could not raise the factual basis of claims (1), (2), (3) or (5) in original post-conviction petition or in an amended petition during collateral review, where the petitioner was not present during evidentiary hearing but stuck in prison during proceedings and deprived of the information that Billings had affirmed that he did

---

[2]  Even if the Court were to determine that the difference in factual predicate did not have a substantial effect on the substance of Petitioner's argument, see *Boyko v. Parke*, 259 F.3d 781, 788-89 (7th Cir. 2001), a matter on which the Court expresses no opinion, Petitioner failed to exhaust Claims 1, 2, and 3 to the extent that they rested on the Billings affidavit. His pursuit of the Billings affidavit claims consequently cannot save his claims based on the Billings testimony from procedural default. See *Stevens v. McBride*, 489 F.3d 883, 893 (7th Cir. 2007) (noting that although counsel's performance is assessed as a whole, and a claim alleging ineffectiveness calls into question all of counsel's actions, "the purposes behind the rules of procedural default require[ ] a party to present to the state court both the facts and the law on which he relies. Thus, the failure to alert the state court to a complaint about one aspect of counsel's assistance will lead to a procedural default.").

not see petitioner shoot the deceased." [27] at 7. Petitioner also argues that the recent Supreme Court case *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), permits him to show cause due to the alleged inefficacy of his post-conviction counsel, who he alleges was constitutionally ineffective under *Strickland v. Washington*, 466 U.S. 688 (1984). As to prejudice, Petitioner contends that had he known of the Billings testimony – at least, the isolated portion in which Billings stated that he did not see Petitioner shoot Hopkins – he would have been able to demonstrate that the State's witnesses lied before the grand jury, at the motion to suppress hearing, and at his trial, and that in the face of Billings's testimony he would have not been indicted, his statement would not have been admitted at trial, and/or he would not have been convicted. Notably, Petitioner does not argue that he is actually innocent or that a fundamental miscarriage of justice will occur if the Court does not consider his claims on the merits; the Court need not consider these potential grounds for relief from default. See *Thompkins v. Pfister*, 698 F.3d 976, 987 n.5 (7th Cir. 2012).

### a.    Cause

Petitioner contends that cause exists because he was unable to discover and in fact did not discover the Billings testimony until his state post-conviction proceedings had nearly concluded. "[C]ause for a default is ordinarily established by showing that some type of external impediment prevented the petitioner from presenting his federal claim to the state courts." *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004). The external impediments that Petitioner asserts here are his absence from the evidentiary hearing and counsel's failure to provide him with a copy of the motion to withdraw. See [27] at 7. (Curiously, he does not fault counsel for taking years to track down Billings and obtain the testimony, nor does he explain why Billings did not

21

include this testimony in the affidavit.) Petitioner contends that these impediments are both a product of his post-conviction counsel's alleged ineffectiveness.

As a general rule, the performance of post-conviction counsel does not afford a basis to excuse procedural default. See *Szabo v. Walls*, 313 F.3d 392, 397 (7th Cir. 2002) (citing *Coleman v. Thompson*, 501 U.S. 722, 752-57 (1991), and *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987)); see also *Serio v. Pfister*, 2013 WL 593824, at *6 (N.D. Ill. Feb. 14, 2013). The Supreme Court recently recognized a narrow exception to this general rule in *Martinez v. Ryan*, 132 S. Ct. 1309, 1320 (2012), in which it qualified *Coleman* by holding that "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." Thus, under *Martinez*, petitioners who default a claim that their trial counsel was ineffective may establish cause for the default by demonstrating that "appointed counsel in the initial-review proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668 (1984)." *Martinez*, 132 S. Ct. at 1318. Petitioner argues in his reply brief that *Martinez* permits him to demonstrate cause, and sets forth a lengthy analysis of his post-conviction counsel's alleged ineffectiveness under *Strickland*. See [27] at 7-24. Petitioner's reliance on *Martinez* is mistaken. The Supreme Court expressly circumscribed the reach of *Martinez* to the "limited circumstances" presented by that case, explaining that "[i]t does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons." *Martinez*, 132 S. Ct. at 1320. The first occasion

that Illinois allows prisoners to present claims of ineffective assistance of trial counsel is on direct appeal. See *People v. Miller*, --- N.E. 2d ---, 2013 WL 1625015, at *11 (Ill. App. Ct. Apr. 15, 2013) (citing *People v. Banks*, 934 N.E.2d 435 (Ill. 2010)). This procedural structure means that *Martinez* is inapplicable here. See *Phillips v. Superintendent, Ind. State Prison*, 2012 WL 6097019, at *3 (N.D. Ind. Dec. 7, 2012) ("The *Martinez* exception applies only in states where state law requires that "claims of ineffective assistance of trial counsel *must* be raised in an initial-review collateral proceeding." (quoting *Martinez*, 132 S. Ct. at 1320)); see also *Guerrero v. Rednour*, 2013 WL 1403209, at *5 (N.D. Ill. Apr. 3, 2013); *Gill v. Atchison*, 2012 WL 2597873, at *5-6 (N.D. Ill. July 2, 2012); *Blair v. Rednour*, 2012 WL 1280831, at *4 (N.D. Ill. Apr. 11, 2012).

### b.       Prejudice

In any event, even if the Court were to conclude that Petitioner has established cause, his claims are still defaulted because he is unable to demonstrate prejudice. "In order to show prejudice, [Petitioner] must prove that any errors worked to his '*actual* and substantial disadvantage.'" *Richardson v. Briley*, 401 F.3d 794, 801 (7th Cir. 2005) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). He must "shoulder the burden of showing, not merely that the errors at this trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982)). This is a high standard; Petitioner must convince the Court that "there is a reasonable probability that the result of the trial would have been different" if Billings had testified that he never saw Petitioner shoot the deceased. *Richardson*, 401 F.3d at 801 (quoting *Strickler v. Greene*, 527 U.S. 263, 289 (1999)).  Put yet another way, the Court must decide whether the Billings testimony "could reasonably be taken to

put the whole case in such a different light as to undermine confidence in the verdict." *Id.* (quoting *Strickler*, 527 U.S. at 290).

Petitioner cannot meet this high standard. Petitioner argues that Billings's testimony that he never saw Petitioner shoot the deceased directly undercuts police reports and grand jury testimony stating that Billings identified Petitioner as the shooter. However, Billings's testimony, as a whole, was that he did not see Petitioner shoot Hopkins, but, after hearing gun shots and turning around seconds later, saw Hopkins falling to the ground and Petitioner running away from Hopkins. Had Billings testified, it seems highly unlikely that his testimony would have affected the outcome of the suppression hearing, much less the trial. See *McNary v. Lemke*, 708 F.3d 905, 916 (7th Cir. 2013). Billings may not have seen Petitioner pull the trigger, but reasonably would have been able to infer from what he did see that Petitioner was the shooter and report that information to the police. This circumstantial evidence from Billings would have added to, not detracted from, the State's case against Petitioner. Moreover, Petitioner has not presented any evidence that Billings would have testified not only that he did not see Petitioner shoot Hopkins, but also that he never identified Petitioner as the shooter when approached by the police. Billings's testimony that he did not directly see the shooting alone or together with his other testimony as reported through Petitioner's post-conviction counsel would not necessarily demonstrate the falsity of the police reports, grand jury, and possible[3] trial testimony concerning

---

[3] At trial, Petitioner's counsel asked Detective Rickher, "what identification did you require of Mr. Billings when you showed him the photo array?" Detective Rickher did not recall. Petitioner's counsel then asked, "Did you recall – did you ask for any identification from Mr. Billings when you showed him the photo array?" Detective Rickher responded, "No." Petitioner appears to suggest that this testimony unequivocally demonstrates that Billings never selected Petitioner's photo from a photo array. Given the ambiguity of the questions, however, it is unclear what the import of Detective Rickher's testimony was: it could have been that he failed to ask Billings to identify Petitioner in the array, or it could have been that he failed to ask Billings for documentation proving Billings's own identity (*e.g.*, a driver's license) when he showed Billings the photo array.

Billings's identification of Petitioner as the shooter. It therefore would have been highly unlikely to have changed the outcome of the suppression hearing or the trial.

Because Petitioner cannot demonstrate prejudice, the Court may not consider his concededly defaulted claims pertaining to the Billings testimony. Claims 1, 2, and 3 are procedurally defaulted.

### 3. Claim 5

In Claim 5, Petitioner contends that his due process rights were violated when the evidentiary hearing was held outside of his presence and when the court denied his motion to proceed *pro se* without first affording him a hearing. This claim is defaulted because Petitioner did not present this claim (or claims) to the Illinois courts. His appellate briefs, [19-14]; [19-16], petition for rehearing [19-17], and petition for leave to appeal to the Illinois Supreme Court [19-19] focus on post-conviction counsel's alleged failure to provide reasonable assistance; they mention his motions to substitute counsel and proceed *pro se* in passing only, see [19-14]; [19-16], and do not allege that the denial of his motion to proceed *pro se* violated his rights. Claim 5 is defaulted, and the Court may not consider it because Petitioner has not suggested any cause for his failure to pursue relief on this claim in state court.

### B. Post-Conviction Counsel's Performance

In Claim 4, Petitioner alleges that his appointed post-conviction counsel "lacked faith in petitioners credibility and 'abandon' his petition," such that he received "virtually no representation at all, in violation of the United States Constitution, 14th Amendment." [9] at 20. He contends that post-conviction counsel's decision not to amend his petition after speaking to Billings constituted deficient performance, and that he was prejudiced because the new Billings testimony that he had not seen Petitioner shoot Hopkins would have demonstrated the falsity of

Detective Rickher's police reports and testimony and would have undermined Petitioner's conviction. (Petitioner neither discusses the impact of the remainder of Billings's testimony nor explains why he finds it more credible than the previously submitted Billings affidavit.) Respondent argues that this claim must fail because ineffective assistance of post-conviction counsel is not a basis for federal habeas relief. See [18] at 22-23. The Court agrees.

28 U.S.C. § 2254(i) provides that "The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254." See also *Martinez v. Ryan*, 132 S. Ct. 1309, 1320 (2012) ("[Section] 2254(i) precludes [petitioner] from relying on the ineffectiveness of his postconviction attorney as a 'ground for relief.'"). This statutory provision reinforces the general rule there is no right to effective assistance of counsel in post-conviction proceedings. See *Coleman v. Thompson*, 501 U.S. 722, 756-57 (1991); *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987); *Wainwright v. Torna*, 455 U.S. 586, 587-88 (1982) (per curiam). "Once trial and direct appeals have run their course * * * neither the sixth amendment nor federal law guarantees effective assistance of counsel for collateral proceedings." *Johnson v. McBride*, 381 F.3d 587, 590 (7th Cir. 2004). "Unless state collateral review violates some independent constitutional right, such as the Equal Protection Clause, errors in state collateral review cannot form the basis for federal habeas corpus relief." *Montgomery v. Meloy*, 90 F.3d 1200, 1206 (7th Cir. 1996) (citations omitted). Petitioner has not alleged – or has defaulted – any independent constitutional claims arising out of his post-conviction proceedings. Claim 4 is not cognizable.

## C. Certificate of Appealability

Under the 2009 Amendments to Rule 11(a) of the Rules Governing Section 2254 Proceedings, the "district court must issue or deny a certificate of appealability when it enters a

final order adverse to the applicant." Accordingly, the Court must determine whether to grant Petitioner a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).

A habeas petitioner does not have an absolute right to appeal a district court's denial of his habeas petition; instead, he must first request a certificate of appealability. See *Miller-El v. Cockrell*, 537 U.S. 322, 335 (2003); *Sandoval v. United States*, 574 F.3d 847, 852 (7th Cir. 2009). A habeas petitioner is entitled to a certificate of appealability only if he can make a substantial showing of the denial of a constitutional right. *Miller-El*, 537 U.S. at 336; *Evans v. Circuit Court of Cook County, Ill.*, 569 F.3d 665, 667 (7th Cir. 2009). Under this standard, Petitioner Turner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 336 (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). And in cases where a district court denies a habeas claim on procedural grounds, the court should issue a certificate of appealability only if the petitioner shows that (1) jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, and (2) jurists of reason would find it debatable whether the district court was correct in its procedural ruling. See *Slack*, 529 U.S. at 485.

The Court concludes that Petitioner has not made a substantial showing of the denial of a constitutional right, nor is there any reason to conclude that reasonable jurists would differ on whether his claims are defaulted under 28 U.S.C. § 2254(b) or cognizable under 28 U.S.C. § 2254(i). Thus, the Court declines to certify any issues for appeal pursuant to 28 U.S.C. § 2253(c)(2).

**IV.     Conclusion**

For these reasons, the Court denies Petitioner Ronald Turner's petition for habeas corpus.

The Court declines to certify any issues for appeal under 28 U.S.C. § 2253(c)(2).


Dated: May 24, 2013                                    _____
                                                       Robert M. Dow, Jr.
                                                       United States District Judge